Good morning, Your Honors. Andrea Miller for the appellant. Before I state my time saving, I'm Could you put the microphone down? Yes. Before I indicate my time saving, I've been instructed by the Eastern District of California to tell Judge Schroeder that we miss her. Thank you. I would like to try to reserve two minutes. I'm doubtful about that, but I will try. Okay. There are two critical factors in this case. What we had here were two independent businesses, one of which my client, Mr. Pardini in D.C., had a computer program whereby they could assist car dealers in dealing with regulatory changes. The other party had another program called eCredit, which would help car dealers deal with credit applications, and they had connections to the various credit bureaus. They decided to join together and provide a full service to car dealers. That's what started it. My client used his facilities, used his programmers, and so on, and they began to work on a web-based program that would speed things up. They came to grief, and they started to unwind their businesses, and they ran into trouble. And the problem manifested seriously in the middle of settlement discussions when the other side filed a complaint indicating that my client had stolen and was sequestering the source code for the new program, specifically his part of it, the EF&I program, which was about the regulatory issues. They insisted that they didn't have it and they needed it to run their businesses. That persisted through the case. Ultimately, in August of 2010, the district court enjoined my client from certain activities and enjoined them from accessing, copying, using, doing anything with the source code. By the time they got to settlement discussions, finally, the other side admitted that they did have the source code for the EF&I program, which was my client's program, and that they downloaded it to a flash drive while one of their principals, Mr. Larson, was employed as a 1099 employee for D.C. and a regular employee for CBC. Everything about the settlement agreement focused on that source code for obvious reasons. The source code was the business. So they extracted a lot of promises in the settlement agreement and in the addendum to the settlement agreement. They got warranties. Only one copy had been made. It was on this specific flash drive. They would produce that flash drive. They warranted there were no other copies, that they had used it in no way. Is it an accepted fact at this point that the original flash drive no longer exists? That's the representation. It was destroyed, yes, after the agreements were signed. And you agree that that's the case? We don't know what happened to it. The story changed so many times that it's difficult to know. That was what Mr. Larson declared was that he discovered there was proprietary information on that flash drive. He didn't tell anybody that. Instead, he purportedly transferred, not copied, and used that phrase for obvious reasons. He was enjoined, and he'd agree not to do that. But our expert said you can't transfer from one flash drive to another, and he created a new flash drive. That's what he produced. He said he then destroyed the flash drive with all the proprietary information and the original code on it. The reason, obviously, that my clients insisted on getting the exact flash drive was that is the only way to know if other copies had been made, if it had been put to use, if it had been transferred somewhere. Well, if it is true that the original flash drive was physically destroyed and no longer exists, what is the remedy that you would like to have in terms of specific performance? Because, obviously, if the flash drive existed and it was not given to you, that would be a clear instance of getting specific performance. Give me the flash drive. Right. So what remedy is appropriate if it, in fact, doesn't exist? I mean, I assume that, you know, part of your comments sound like, well, we're not sure it doesn't exist. We have this representation. That's a separate issue, perhaps. Well, the Court certainly accepted everything Mr. Larson said, even though he changed his story many, many times. The remedy was written into the MOU. The remedy for breach of a material term, and the material terms are clearly laid out and they focus on source code, was to get rid of the permanent license, which was the other part. So that's what you want specifically performed? Yes, is the agreement, the agreement itself with the warranties. The district court said that the other side was to be given an opportunity to cure. That was also written into the settlement agreement. It was written into the settlement agreement they had an opportunity to cure. How do you cure destruction of evidence, which he did after he signed the agreement? How do you cure the fact that your representations in the agreement were wholly false, that there were other copies made, that they were added to, they were changed? How do you cure that? And that's the problem. That was the material part of the contract. You can't cure an absolute and utter misrepresentation that induced the other party to enter the agreement. Well, what was the misrepresentation that caused you to enter the agreement? That there was only one copy of the source code and that they would produce it. That was the representation. Well, they had one copy that they said was inadvertent that was on this other computer under an odd file that suggested it had been created in connection with discovery. The other question is the flash drive. Right. And he's offered an explanation for the flash drive and told you that he can't produce it. It's no longer there. It's gone. The problem with it is his explanation for the destruction of the flash drive makes no sense. His explanation for downloading that flash drive into a computer, which the expert also found, makes no sense. He said, for instance, he downloaded it so that he could do Rule 26 initial disclosures and provide it to his attorney. His attorney denies that she can't remember that she ever saw it. If you've seen source code, you know what it looks like and you would remember you saw it. She said her firm did not have a copy of it. That doesn't mean it was provided to somebody else. The thing was labeled as complies with the Rule 26. That doesn't mean he actually ever did anything with it, because labeling is just labeling on a computer program. I understand, but the misrepresentation is important because he did the download, according to the expert, in January of 2011. Docket 71 discloses that the initial disclosures were to be made in December 2010. So that could not have been the purpose for this download. All of this, when you take it together, demonstrates why your precedent and California court precedent in interpretation of contracts and warranties requires some testimony and cross-examination. He gave four or five declarations, all of which morphed every time the expert discovered something or a challenge was made. He moved through so many explanations that by the end, it seemed inherently intuitive to me that you couldn't rely on anything he said. Did he destroy it? God knows. Is it around someplace? God knows. What do we do with the fact that the district court was familiar with the settlement agreement and familiar with the parties and familiar with the issues and chose not to find that Mr. Larson had materially misrepresented what happened here and why he destroyed the flash drive and why he made this copy? I can't do much with that. I mean, it's interesting to me that the law is clear that in this situation, you need to give an opportunity for cross-examination under oath. He became familiar with the parties. They sat in chambers days on end trying to settle this thing. Yes, he knew them. Had he ever seen them testify under oath? Had Mr. Larson ever been directly challenged? No. And I think that was a critical error on Judge Beck's part, as great a judge as he is. I think he just wanted to preserve the settlement agreement and keep it off the court's docket. And I get that, too. But he did not follow the prescriptions that are in the cases. You have a point. I just want to make sure I understand. I'm still back with where Judge Graber was. If you prevail, then the result is that they can't use the software? That the license goes away. Yes. Because that's the cure that's in the agreement itself for breach of a material term. Okay. Okay. Thank you. We'll give you a little extra time. We've used a lot of it with questions. Thank you. We'll hear from opposing counsel. Thank you. May it please the Court. I'm John Tamberelli. I represent the FLE. Could you speak a little louder, please? Sure. I'm sorry. My name is John Tamberelli. I represent the FLE Credit Bureau Connection. I would like to touch on one point here because this was addressed, but I don't think the point was addressed properly. What is happening here is the appellant is wanting to take apart a 35-page, single-spaced settlement agreement that relates to many, many items of licensing, royalties, software, upgrades, all of that information, and then say, well, one part in an addendum that was signed said that you were going to turn over this flash drive. You didn't. Therefore, we want everything wiped out. But isn't that a factual question about the party's intent that ought to be dealt with at a full hearing? It's difficult for strangers to the contract to determine what is a material term. And if it turns out that returning the original flash drive was a material term and it has been breached, then the contract itself does provide for a remedy. Well, it does. But it seems to me essential to find out is this material, and if so, having breached, has there been a cure that is adequate within the party's contemplation? And I don't understand how we can decide that without the Court having a hearing. Well, Judge Beck did decide that after a hearing that took place with all of the evidence that was necessary to be supported by the declarations of experts. There was no live testimony. No, there was not. And there was no, particularly there was no testimony about what the parties intended and exactly why they included the flash drive requirement and the specific remedy of doing in the license in the event that there was no cure. And what did cure mean in this context? Well, if I may, Judge Beck, as has been admitted and everybody knows, was intimately involved with these people working out this settlement over many, many months. So he would be the best person to know as to what was intended, what wasn't intended, and what was negotiated and what was discussed, as he was all part of those settlement discussions. What I would like to focus in on, however, is that what was the purpose of turning over this flash drive? My clients disclosed the existence of a flash drive. They had nothing to hide. When my clients understood they were supposed to turn over this source code, that's in effect what they did. It may not have been on this specific drive, but the data itself, which is what is important here, was what was turned over. Well, that is the question, whether that is what is important. It's like my purchasing a piece of artwork, and I have a particular fascination for a certain painter, and what you turn over to me is a copy of the painting, or you turn over somebody else's painting that may be worth even more, but that's not what I bargained for. So isn't it important to know more about what the parties were thinking about, whether that specific flash drive was important? Because certainly that's a permissible term. Well, it may be important to know what the parties' intent were, but the issue that is being addressed is whether they should terminate a license, as I said, of a 35-page agreement that addresses many, many issues. And so the remedy that's being sought, as Judge Beck found, was not being supported by the claimed material breach of what was being claimed as being materially breached. Yeah, there was a zip drive that was found on a stand-alone laptop that was deleted. It was taken, and it was gone. That no longer is an issue. As it related to this drive, should Mr. Larson have told his counsel in retrospect, hey, by the way, and this all would have been brought out in the beginning, yeah, most likely that should have happened, but it didn't. What he did was try and comply with the terms and conditions of the settlement agreement and the memorandum of understanding, which, I'm sorry, the addendum to the memorandum. The district court found that there was a breach. Yes, that is correct. So the remaining questions, it seems to me, to determine whether to put into effect the party's remedy of terminating the license would be is it material and has it been cured. But I don't understand how under our cases the judge can decide that without having a full-blown testimonial hearing. Because it's not about what the judge thought. It's about what the parties thought at that point. I understand that. Judge Beck, if I do recall, did ask counsel at the hearing if anybody wanted to present any live testimony or any further testimony, and counsel for the appellant declined to do that. So he did make an offer. I believe that is in the record. I was reading that this morning. Do you have the record cite on that, counsel? It's in the transcript from the hearing. I have it marked over there. But it is in the transcript from the hearing with Judge Beck. He does ask if there's any other evidence that anybody wants to put on or any cross-examine that people want. And my client was able to do that. Did he offer cross-examination? Since you didn't have examination under oath, what kind of cross-examination would he have offered? Well, I wasn't planning on cross-examining anyone. Mr. Haig was there, their expert. Mr. Larson was there. Mr. Frank Larson was there. Mr. Green was there. But that offer was made, and that offer was not accepted by counsel for Mr. Pardini. And he was the moving party. He had that burden of proof. So, you know, again, that to me would be a waiver of such a request at the time. And the papers were submitted on the declarations and replies and supplemental declarations. So you're saying this has to be decided on this record? My feeling is that the judge did not abuse his discretion procedurally or substantively. He made the determination that he had based upon what was in front of him, and he did make an offer to counsel for the plaintiff if they wanted to put on any live testimony. If there are no other questions, I would submit. I don't believe there are. Thank you. Thank you very much for your time. Ms. Miller, you've used a lot of your time. You can have about a minute extra to. Well, I would point out that with regard to the context, the thing about live testimony, I did not see what he mentioned in the transcript. I do see on page 394 of the transcript of the ER that Mr. Mackman, the judge asked him if Mr. Mackman, if he had any additional evidence, and he responded, that was the core evidence. And then so I think this was the suggestion that he was making, unless you have a desire to talk, to hear from either the expert. At that point, did anybody request a hearing? Did anybody request that Mr. Larson be put under oath? Did anybody request an opportunity to cross-examine him? It was not requested. Okay. Did both sides file papers? He offered the fact that they were both in the courtroom and available. And you don't dispute that? No. So they were in the courtroom, they were available. Yes. Nobody asked to be able to cross-examine Larson. So is there any evidence that you wanted to put in that you didn't get an opportunity to put in? I can't state that categorically. What I can say is that the judge should have cared. But you didn't tell the judge. Well, you want the judge to correct your, to argue the case for you? It wasn't there, but no. I understand. I'm using you, I'm using you in the royal sense. I want the judge to understand that he's making a decision on terribly conflicted evidence. Right. But if that's the case, then you would have been perfectly within your rights to say, Judge, I don't think you can decide this on this record, and we would like to have, we would like to have a hearing. Or let's let this be the hearing, and let's put Mr. Larson under oath. And you can talk to him, and we'd like to talk to him, and let's do it right now. Did anybody say that? Nobody said that. Okay. Did you file all your paperwork? I mean, did you file, both sides filed all the paperwork with the evidence they wished, with declarations from the parties. Yes. So did you assume that the district court was going to be able to decide it on that record? I can only imagine what was in their minds. I thought they, I think they believed the conflict was so apparent that the judge would see it. Okay. All right. So you thought that the record would, that you would prevail on that record. So you didn't ask for anything else in the proceedings. Not expressly, no. Okay. The other thing that I would point out one more time is that if you look at the memorandum of understanding on page 323, further on in the agreement, they identify five paragraphs that are material. In paragraph 1, those are F, G, H, I, and J. Every one of them except one speaks to the source code. Every single one of them. And we also have to remember that even if this licensing agreement is destroyed, appellants still have their e-credit. We have our EFI. And under the case law, if eventually they do, it turns out that they do have that source code and they do use it and we find it, we can still sue them for damages. That's the last mistake the judge made. He said if you can't show monetary damages, the warranty doesn't matter, the copyright law doesn't matter, nothing matters. Well, the judge said that copyright was an entirely separate matter and that you would have to bring a separate suit for copyright infringement. He did. That wasn't a term of the contract. True. I have nothing more to say. Thank you, counsel. I appreciate the arguments of both counsel. And the case is submitted.
judges: SCHROEDER, GRABER, BYBEE